UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SCOTT KNOUS,<br><br>    Plaintiff<br><br> v.<br><br>BROADRIDGE FINANCIAL SOLUTIONS, INC.<br><br>    Defendant | <u>Jury Demanded</u><br>Civil Action No.: 1:20-cv-11245 |

# **COMPLAINT AND JURY DEMAND**

## **INTRODUCTION**

  While working for Defendant Broadridge Financial Solutions, Inc., ("Broadridge"), Plaintiff Scott Knous discovered a fraudulent billing scheme wherein Broadridge clients were receiving data from Bloomberg, LP through Broadridge software products and Broadridge was underreporting the data usage to Bloomberg. This fraudulent scheme deprived Bloomberg of revenue. When Knous complained to his manager, Brian Crowley, and scheduled a conference call about the situation, Crowley demanded no one on the call put anything in writing about the situation or discuss it with anyone outside the call. Knous immediately began being frozen out and retaliated against and berated by superiors to whom he complained. A couple of months after Knous first complained of the Bloomberg issue, he was terminated, supposedly as part of a "massive global reorg," although only two other employees were laid off around the same time as Knous – one in St. Petersburg, Russia, one in New York – both of whom, unlike Knous, were on Performance Improvement Plans.

## PARTIES

1. The Plaintiff, Scott Knous, is an individual residing, at all times relevant hereto, within the Commonwealth of Massachusetts in Suffolk County.

2. The Defendant, Broadridge Financial Solutions, Inc. (hereinafter "Broadridge") is a Delaware Corporation with its principal place of business located in Lake Success, NY.

## JURISDICTION AND VENUE

3. This Court has federal question jurisdiction over this case.

4. The Plaintiff states a claim under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A (hereinafter "Sarbanes-Oxley"). Pursuant to 18 U.S.C. § 1514A(b)(1), a whistleblower terminated in violation of Sarbanes-Oxley must first file a complaint with the Secretary of Labor in order to seek relief. The Secretary of Labor has designated responsibility for handling Sarbanes-Oxley whistleblower complaints to the Occupational Safety & Health Administration ("OSHA").

5. Plaintiff filed his claim with OSHA on July 30, 2019.

6. Pursuant to 18 U.S.C. §1514, if the Secretary of Labor does not issue a final decision within one hundred and eighty (180) days of the filing of the complaint, the whistleblower may file suit in the appropriate United States District Court. The Secretary of Labor has not issued a final decision in the case and more than 180 days have elapsed since the filing of the case.

7. Therefore, this Court has 28 U.S.C. § 1331 federal question over this case.

8. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the acts or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## STATEMENT OF FACTS

9. Mr. Knous began working for Broadridge as a Vice President, Product Management in May 2018.

10. Mr. Knous was aggressively recruited from another firm, where he led the data management consulting practice.

11. At Broadridge, Mr. Knous assumed direct responsibility and oversight for more products than any other product manager. For most of his tenure, Mr. Knous was the only day-to-day product manager for four separate data products: Security Master, Price Master, DQM and BMDS/Data Care.

12. Mr. Knous had many successes at Broadridge.

13. Mr. Knous instituted reforms that improved the software development pipeline.

14. Mr. Knous was also allowed to hire and organize a new data management organization. This team was announced on November 28, 2018, less than six months before Mr. Knous' termination.

15. Mr. Knous was also an important asset to sales. He instituted weekly "Talking Data" sessions to educate sales staff on products. He developed a new spreadsheet to assist sales in pricing, an innovation that helped improve turnaround time for sales quotes.

16. In September 2018, Mr. Knous interrupted a personal vacation to attend and speak at an event in Milan, Italy and one in Germany. Mr. Knous' talk at the Milan conference was voted the best session of the conference and generated leads among buy-side clients. Mr. Knous' attendance and faciliation at the German client workshop, and his fluency in German, created greater credibility for Broadridge in a market segment where they had limited exposure for the products Knous represented.

17. In late February 2019, Mr. Knous uncovered a fraud involving Bloomberg, LP.

18. Some of Broadridge's products draw upon data from third parties, such as Bloomberg LP ("Bloomberg"), and the third parties are generally compensated for that data usage under various agreements.

19. In late February 2019, Mr. Knous began to learn of instances where Broadridge was delivering certain Bloomberg data to clients without reporting that data usage to Bloomberg and in fact was submitting false accountings to Bloomberg.

20. On March 6, 2019, Mr. Knous uncovered that these discrepancies were not isolated; they were pervasive and systematic.

21. What Mr. Knous learned was that users of Broadridge's Asset Management Solutions were able to access some Bloomberg data through a Broadridge database known as "Security Master Golden Copy" ("SMGC"), without this data usage being reported to Bloomberg. One of Bloomberg's priciest categories of data – known as "Corporate Actions" data – was being accessed in this manner.

22. At least monthly, over the internet, by FTP server, Broadridge reported client usage of Bloomberg data to Bloomberg so that Bloomberg could bill the users.

23. However, Broadridge was underreporting the Corporation Actions data, due to the fact that Corporate Actions data accessed via SMGC was not reported at all.

24. The effect of this underreporting was that Broadridge clients paid less for the data than they should have.

25. The scale of the underreporting ran into millions of dollars.

26. Upon learning of this fraud, Knous alerted his manager, Brian Crowley, warned Crowley that the conduct seemed to be illegal, and scheduled a telephone meeting for March 8 at 10:00 a.m. with himself, Crowley, Jim Anglin and Ty Farmer.

27. On the March 8 conference call, Crowley stated that Broadridge had known about the underreporting issue for years.

28. Crowley cautioned that nothing concerning the Bloomberg issue should be put in writing; it should only be discussed over the phone and within the group.

29. Crowley said he did not want a paper trail regarding the matter.

30. Crowley also suggested that the underreporting would not continue once the data was migrated from SMGC to segregated databases, an event which was scheduled to be completed by year-end.

31. Based on communications that Knous had had with colleagues Jim Anglin and Stephanie Hunt in advance of the March 8 conference call, Knous had suspected that Broadridge had been aware of the problem for some time. Crowley's admission that Broadridge had longstanding knowledge of the underreporting confirmed Knous' worst suspicions and negated the possibility that the underreporting was negligence, rather than deliberate fraud.

32. On March 12, Knous began a pre-planned vacation.

33. Upon his return, Knous emailed Broadridge's compliance department about the Bloomberg situation.

34. On March 20, 2019, Mark DiGidio, from Broadridge Compliance department, acknowledged Knous' email and promised to investigate.

35. On March 31, 2019, Knous emailed Brian Crowley, saying:

    Brian,

> On Friday afternoon, I reported to Compliance the issue of Broadridge's distribution of Bloomberg Corporate Actions data to clients without reporting it to Bloomberg. It should come as no surprise that I came away from the meeting on March 8th with grave concerns about the unwillingness to become transparent and rectify a situation which seems to not only violate Bloomberg's Terms of Service, but also Federal laws. I trust that Compliance can advise on the best way forward.

36. In response to Knous' email, Crowley emailed Knous, suggesting a call with Knous on the afternoon of April 1.

37. On the April 1 call, Crowley's first words were to ask Knous what Knous expected from him as a response.

38. Knous told Crowley that he expected Crowley to address the problem he brought to him. Knous said Crowley did not owe a personal response to him; he owed a duty to address the fraud.

39. Crowley asked Knous why Knous did not approach him and Knous said he had approached him but was met with resistance.

40. Crowley asked Knous if Compliance were going to contact him.

41. Knous answered that he was not certain of the process that Compliance would follow.

42. Crowley then asked for the name of the Compliance person Knous had spoken to and said, "I was not even aware we had a Compliance group."

43. After the phone call, at 4:00 p.m. the same day, Crowley sent Knous an

email proposing, "upon reviewing all of the facts of the matter," to approach Bloomberg in the manner he had approached the London Stock Exchange ("LSE") in an earlier episode where Broadridge was using LSE data without a so-called SEDOL identifier required by the LSE.

44. In a reply email of 4:33 p.m., Knous distinguished the LSE and Bloomberg situations and asserted, "This [the Bloomberg issue] is a Broadridge issue which we must own. For years, Bloomberg has been knowingly distributing data to clients without reporting it to Bloomberg and done nothing about it….Also we need to start reporting the corporate actions data to Bloomberg immediately."

45. Crowley responded tersely:

"Scott –

This matter will be discussed and ultimately resolved with the input of both the leadership team and compliance in the coming days."

46. Knous forwarded the correspondence to Mark DiGidio, who replied that he did not need to be copied on such correspondence.

47. From the time Knous first raised the Bloomberg issue, he found himself isolated and frozen out.

48. Knous' weekly one-on-one meetings with Crowley were declined in perpetuity.

49. The number of items on his calendar dwindled, as Knous was not invited to meetings that he normally would have participated in and he was disinvited from other meetings. He was excluded from client meetings for the Price Master product for which he was Product Lead.

50. Tasks that had once been Knous' responsibility were assigned to his subordinates. For instance, without informing Knous, Crowley made Knous' subordinate, Sunny Feng, the lead on a statement of work ("SOW") which Knous had created and managed to the

point of near-final edits. Feng called Knous to inform him, confessing that he had no idea why Crowley would have him step into Knous' shoes.

51. Knous was denied permission to attend client-facing events.

52. For instance, Knous was uninvited to the Cutter Managed Data Services event in New York City on April 25, allegedly due to the travel and entertainment budget being limited through June 30.

53. However, when Knous offered to cover the cost out of his own pocket, Crowley refused. Instead, the open ticket was to be offered to a product manager from Knous' own team.

54. Knous also had his request to attend a FIMA conference in Boston rejected.

55. On April 10, 2019, Knous emailed Eric Bernstein regarding the retaliation against him.

56. Knous wrote in his April 10, 2019 email:

> Eric,
>
> On March 8th, I raised an issue to Brian that we were illegally electronically distributing Bloomberg Corporate Actions data to our clients which seemed to be a breach of Bloomberg's Terms of Services and illegal. On that call, there was both acknowledgement that it was a known issue by management, and resistance to discuss and address that issue. No actions were taken over the couple weeks following my raising the issue, so I reported it to Broadridge Compliance. I have been told that Broadridge Leadership is working with Compliance on the issue.
>
> I am emailing you about how I've been treated by the Leadership team since I first raised the issue on March 8th. In summary, Leadership has been stripping me of project and day-day responsibilities. There's been an obvious deference to my team members and others across the company on tasks and responsibilities which would normally be mine. Also, outreach and engagement by the Leadership team has been far reduced since March 8th. This sudden change has made it increasingly more difficult to do my job, and has prompted multiple people at the company to ask me what's going on.
>
> Below are some examples of what the Leadership team has done recently:

Case 1:20-cv-11245-LTS   Document 1   Filed 06/30/20   Page 9 of 16

- Declined attendance and participation for my weekly 1:1, which was my main communication conduit and my way of communicating my team's and my activities;

- Removed me as Product lead on the Simcorp project, as evidenced in multiple ways including deference to a less experienced and more junior person from my team, despite me having worked on the project day-day and the new SOW since December;

- Declined my request to attend FIMA conference in Boston stating that the firm doesn't see value in attending industry conferences. However, other Product Managers are attending industry conferences;

- Removed me from the Sales Offsite agenda citing the topic of data products were removed from the agenda. However, data later added back on the agenda and I was not invited to attend (even by phone) but one of my product managers was invited;

- Uninvited to the Cutter Managed Data Services event in NYC April 25 due to T&E being limited through June 30. Since I led the RFI response process and wrote the document, I offered to personally cover my own T&E expenses. But I was still denied, saying the open ticket would be offered to a Product Manager from my team.

I would appreciate you attending to this matter.

Regards,

Scott

57. In response, Bernstein acknowledged being aware of the Bloomberg issue and claimed he was involved in attempting to resolve it.

-9-

58. Bernstein also stated that he had personally made the decision to remove Knous from the Sales event and had done so prior to the March 8 meeting about the Bloomberg corporate actions data.

59. However, Bernstein professed ignorance as to the "other items" raised by Knous and stated, "I will look into them as these are important and glad you alerted me."

60. On April 11, 2019, at 4:15 p.m., Knous and Bernstein had a call, scheduled by Bernstein to last 15 minutes, but which ran 45 minutes.

61. During the call, Bernstein berated Knous and, for the first time, told Knous that he thought Knous was underperforming.

62. Bernstein began berating Knous and stated that Knous was overpaid and added no value. Bernstein claimed that, for the past nine months, he had been sending emails to Brian Crowley, as well as Knous' HR file about Knous' supposed underperformance.

63. When Knous challenged Bernstein on any documentation having been added to his HR file, Bernstein backtracked and said he didn't mean to say his "HR file" – he meant Crowley.

64. During the call, Bernstein labeled Knous a "terrible communicator and poor listener."

65. Bernstein claimed, "I've been very successful at every role I've been in and I know quickly who is an underperformer and who isn't."

66. When Knous asked for specific examples of his underperformance, Bernstein cited Scott's biweekly sales training calls, which he labeled "horrible."

67. When Knous noted that sales team members had raved to him about the calls, Bernstein replied that the people who matter all thought the calls were a waste of time.

68. Bernstein also claimed to have met with Bloomberg the previous day and to

have resolved the issue.

69. Bernstein said the resolution had been forwarded to Compliance for approval.

70. However, Bernstein did not provide any details of the proposed agreement.

71. Bernstein stated that he did not know about the March 8 conference call where Knous complained of the Bloomberg fraud.

72. Bernstein also professed ignorance of the fact that Knous had been the one to report the fraud to Compliance on March 29.

73. Bernstein said he had investigated all of Knous' complaints of retaliation and determined they were all unfounded. He cited the fact that Brian Crowley's assistant, Marlee, had been the one to decline the April 1 one-on-one meeting, not Crowley himself (ignoring of course that Crowley himself declined the meetings in perpetuity).

74. Bernstein told Knous that he was undertaking a large restructuring of the business and that restructuring would involve the elimination of underperformers and the rewarding of high performers. Bernstein said he had to take such steps to ensure that Broadridge succeeds.

75. Following the phone conversation between Bernstein and Scott, Bernstein emailed Knous:

> "Hi Scott –
>
> Thanks for the call today. I appreciate your concerns and am glad you reached out to me. In conclusion, I don't see any change post March 8th as you mentioned below. I have looked into all the items below and don't feel there was good communication on these items both ways. My

>expectation is both ways, it should have been raised but understand you didn't think he [Brian Crowley] was approachable on these items.
>
>Best,
>
>Eric"

76. On April 26, a Project Update meeting conference call was held with Brian Crowley, Knous and the members of Knous' product team. During the call, Crowley alluded to a one-on-one meeting that he recently had with the President of Broadridge, to discuss a new direction that Product Management and IT Development would be taking.

77. The new direction that Crowley outlined on the call a "data centric" strategy for which Knous began advocating more than six months prior.

78. Following the conference call, Knous emailed Crowley to express his enthusiasm for the new data centric direction and explained how it dovetailed perfectly with his own expertise. As Knous noted in his email, at his prior employer he had spearheaded a move to a data-centric approach and even owned the website domain http://www. data-centric.com. Knous elaborated on his background in data warehousing and in migrating products to the web, key components of the new data centric approach Crowley had outlined on the phone call.

79. Crowley never replied to Knous' email.

80. On May 14, Knous was sent an invitation for a May 17 one-on-one meeting with Brian Crowley. This was the first such meeting scheduled since Crowley had, as alluded to in the foregoing, cancelled all of their one-on-one meetings in the immediate aftermath of Knous' whistleblowing about the Bloomberg issue.

81. On May 17, 2019, Knous met with Brian Crowley and Andrea Brown from Human Resources.

-13-

82. Crowley told Knous that he had bad news – Knous' position had been eliminated.

83. When asked the reason, Crowley said, "This is part of a much larger re-org. This is not isolated to you or this region. This impacts people all across the globe, even as far as Asia. I can't go into exact details, but I can tell you this is part of a major re-org."

84. Andrea Brown affirmed Crowley's representations about the reorg and told Crowley that he was no longer needed and she would go over the paperwork with Knous.

85. Alone in the room together, Knous told Brown that it was obvious that he was being let go because of his whistleblowing, that he had been frozen out immediately after he reported the Bloomberg fraud.

86. Brown denied that was the case and claimed Mark DiGidio had been briefed, as he had been involved by Bernstein and Crowley.

87. Brown claimed that there had been meetings about a reorganization where Knous' position had been discussed that pre-dated the Bloomberg issue.

88. When Knous asked if those meetings had been documented and would withstand scrutiny, Brown, after a long pause, answered, "Yes, for the most part."

89. One piece of paper Brown gave Knous was an OWBPA sheet showing that Knous was one of three people laid off in the massive reorg.

90. Knous remarked, "There are only three people let go and you call this a large global reorg?"

91. Brown did not reply.

92. None of the three employees identified on the OWBPA sheet worked in Asia: one was based in New York City, the other in St. Petersburg, Russia.

93. The New York City and St. Petersburg, Russia employees had been on Performance Improvement Plans (PIPs), whereas Knous had never been on a PIP.

## STATEMENT OF CLAIMS

### COUNT I
### SARBANES-OXLEY WHISTLEBLOWER PROTECTION – 18 U.S.C. § 1514A
### (All Defendants)

94. Plaintiff realleges the foregoing paragraphs of his complaint, as if fully set forth herein.

95. 18 U.S.C. § 1514A prohibits any company with a class of securities registered under § 12 of the Securities Exchange Act of 1934, or required to file reports under §15(d) of the same Act, or any officer, employee or agent of such company, from discharging, harassing, or in any manner discriminating against an employee in the terms and conditions of employment because the employee provided information relating to alleged violations of 18 U.S.C. §§ 1341, 1343, 1344 or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of federal law relating to fraud against shareholders.

96. Broadridge is a publicly-traded company with a class of securities registered under § 12 of Securities Exchange Act. Broadridge is therefore subject to the Sarbanes Oxley Act.

97. Mr. Knous engaged in protected activities under 18 U.S.C. § 1514A because Mr. Knous reasonably believed that Broadridge's conduct violated federal law and constituted wire fraud and he reported the misconduct to personnel with supervisory over him and a compliance department with authority to investigate.

98. As a result of his protected activities under the Act, Mr. Knous suffered adverse employment actions prohibited by the Act.

## **RELIEF REQUESTED**

WHEREFORE, Mr. Knous respectfully requests that this Court:

(a.) Order that he be reinstated or constructively reinstated to his former position, with the same seniority status that he would have had but for the discrimination and enjoin the Defendants from further retaliation against him;

(b.) Award him all back pay and benefits, including salary increases, bonuses, stock options, vacation pay and health insurance, with interest on same running from May 17, 2019 until the date a final judgment enters for him;

(c.) Award him front pay and reputational damages, in an amount to be proved at trial, to compensate him for the loss of income and earning capacity that Defendants' conduct has caused;

(d.) Award him money damages for the emotional distress caused by the unlawful actions of the Defendants;

(e.) Award compensation for all special damages sustained as a result of the Defendants' actions, including litigation costs, expert witness fees and reasonable attorney fees.

(f.) Award all other relief the Court deems necessary to make him whole.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Respectfully submitted,
Scott Knous,
By his attorney,


/s/Alan Crede_____
Alan Crede, BBO #664451
CONFORTO LAW GROUP, P.C.
20 Park Plaza, Suite 1115
Boston, MA 02116
(617)721-9139
crede@confortolaw.com